IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE B. BUCHANAN, II, | ) | Case No. 5:24-cv-00009-DAR |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Willie B. Buchanan II ("Buchanan"), seeks judicial review of the final decision

of the Commissioner of Social Security, denying his applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule

72.2(b). Because the ALJ failed to apply proper legal standards in building an accurate and

logical bridge between the evidence in the record and the RFC determination, I recommend that

the Commissioner's final decision denying Buchanan's applicaitons for DIB and SSI be vacated

and remanded for further consideration of the RFC.

## II.     Procedural History

Buchanan filed for DIB and SSI on August 24, 2021, alleging a disability onset date of

September 23, 2017. (Tr. 434-40). The claims were denied initially and on reconsideration. (Tr.

335-44, 357-64). He then requested a hearing before an ALJ. (Tr. 365-66). Buchanan,

represented by counsel, and a vocational expert ("VE") testified before the ALJ on September 6, 2022. (Tr. 226-62).

On January 10, 2023, the ALJ issued a written decision finding Buchanan not disabled. (Tr. 8-22). The Appeals Council denied his request for review on November 14, 2023, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Buchanan timely filed this action on January 3, 2024. (ECF Doc. 1).

III.    **Evidence**

A.      **Personal, Educational, and Vocational Evidence**

Buchanan was 48 years old on the alleged onset date, making him a younger individual according to Agency regulations, but he subsequently changed age category to closely approaching advanced age. (*See* Tr. 20). He graduated from high school. (*See id.*). In the past, he worked as a stocker. (*Id.*).

B.      **Relevant Medical Evidence**

An EMG/ Nerve Conduction Report from January 19, 2017 indicated that Buchanan had severe left ulnar neuropathy across the elbow and severe left carpal tunnel syndrome. (Tr. 727).

On May 26, 2017, Buchanan saw Daniel N. Moretta, D.O. for hand and wrist symptoms. (Tr. 705). Buchanan reported that he had radiating numbness and tingling from his hand to his shoulder. (*Id.*). He explained that his left hand will go completely numb and is more pronounced in the middle of the night while he sleeps, with no relief from nighttime splints. (*Id.*). Buchanan proceeded with left open cubital tunnel release and left open carpal tunnel release surgery on September 7, 2017. (Tr. 695).

At a September 22, 2017 post-operative appointment with Dr. Cochran, Buchanan reported feeling 75% improvement in his symptoms after surgery. (Tr. 691). He complained of

mild and intermittent pain in his left hand and elbow, and that his left hand was still feeling weak. (*Id.*). However, he felt relief with medication and thought the surgeries were a success. (*Id.*). Notes further indicate that the numbness and pain in the left hand had "essentially resolved" post-surgery. (Tr. 692).

On October 31, 2017, Buchanan presented to Dr. Cochran with right shoulder pain. (Tr. 684). Buchanan could not get relief with NSAIDS, ice, or heat and had trouble sleeping and doing overhead activities. (Tr. 684-85). Dr. Cochran took an x-ray which showed no bone abnormality or alignment problem. (Tr. 685). The physical exam indicated subacromial impingement syndrome with a component of biceps tendonitis. (*Id.*). Buchanan received a steroid injection in the subacromial bursa and was referred for physical therapy. (*Id.*).

Buchanan received physical therapy for his right shoulder impingement syndrome from November 6, 2017 to December 12, 2017. (Tr. 680). Upon discharge, Buchanan stated "'My shoulder is feeling good today. No pain right now. I think we can make today my last day and I can do a strength program at home . . . .'" (Tr. 680). Progress notes state that Buchanan's strength had improved from 4- to 4/5, however his right upper extremity remained slightly weaker than his left. (Tr. 682). There was a negative impingement test on December 12, 2017 and pain had decreased significantly through the course of therapy. (*Id.*). Buchanan received an at home strength program for deltoid and rotator cuff strengthening. (*Id.*).

On February 2, 2018, Buchanan again presented to Dr. Moretta for pain in his right shoulder. (Tr. 675). He reported that the pain was unchanged and requested another injection for relief. (Tr. 677). The previous injection provided 50% relief that lasted three weeks. (Tr. 675). A shoulder and elbow exam revealed normal inspection, strength, and reflexes in the upper extremities with gross sensation intact but pain in the bicipital groove. (Tr. 676). X-rays revealed

no obvious change in alignment or fixation. (Tr. 677). Dr. Moretta gave Buchanan an injection and instructed him to follow up in three months. (*Id.*).

At his follow up on May 5, 2018, Buchanan stated that the injection provided 70% improvement that lasted two and a half weeks and complained of intermittent aching and pain in the right shoulder. (Tr. 661). Dr. Cochran recommended physical therapy for the shoulder pain. (Tr. 663). Buchanan received another injection. (*Id.*).

Buchanan presented to Dr. Cochran on August 3, 2018. (Tr. 655). He complained of constant aching right shoulder pain and reported that the injection provided 50% relief that lasted two and a half weeks. (*Id.*). Buchanan denied weakness, numbness, tingling, or radicular symptoms. (*Id.*). His pain increased with movement and increased activity. (*Id.*). He relieved pain with ice and rest. (*Id.*). Buchanan received another injection. (Tr. 656).

On April 17, 2019, Buchanan presented to Dr. Moretta with pain in his left hand. (Tr. 652). Buchanan reported that pain radiates from his shoulder to his hand, the hand becomes numb, and his fingers lock up. (*Id.*). He reported that symptoms were worse at night. (*Id.*). A wrist and hand exam revealed normal inspection, strength, and reflexes with gross sensation intact and minimal tenderness to palpitation on left carpal tunnel. (*Id.*). Dr. Moretta found that Buchanan's symptoms were consistent with recurrent left carpal tunnel syndrome and suspected median neuritis. (Tr. 653). Dr. Moretta recommended NSAIDs and a nighttime brace. (*Id.*).

On July 5, 2019, Buchanan presented for an appointment with Dr. Moretta for his right shoulder pain. (Tr. 634). Buchanan reported the last injection provided 80% relief that lasted for four months. (*Id.*). Explaining his symptoms, Buchanan stated the pain was burning and intermittent, he was experiencing weakness in his arm due to shoulder pain, and he had a limited range of motion in the right shoulder. (*Id.*). The symptoms resulted in Buchanan having trouble

4

sleeping. (*Id.*). Buchanan felt as though his symptoms were improving but requested another injection, which Dr. Moretta provided. (Tr. 635).

On September 15, 2020, Buchanan saw Cory A. Brown, D.O., with complaints of right shoulder pain. (Tr. 746). Buchanan reported pain increased with movement. (*Id.*). Dr. Brown prescribed Celebrex and referred Buchanan to physical therapy. (Tr. 750). X-rays revealed no fracture or dislocation, osseous structures were intact, no periarticular calcifications and slight sclerosis at the rotator cuff insertion. (Tr. 783).

Buchanan presented for an appointment with Dr. Cochran on February 5, 2021. (Tr. 601). Buchanan stated a problem with his left shoulder onset three months prior without injury or event. (*Id.*). Buchanan reported that the intensity was severe. (*Id.*). He experienced pain, arm weakness, numbness, tingling, stiffness, and limited range of motion. (*Id.*). His symptoms were dull and constant and aggravated by overhead work, sleeping on affected side, and reaching behind. (*Id.*). He treated symptoms with heat and ice. (*Id.*). A shoulder and elbow exam revealed normal inspection and strength, with numbness and tingling in ulnar distribution. (*Id.*). Gross sensation was intact, and he was non-tender to palpitation bilaterally. (*Id.*). X-rays from this encounter demonstrated no acute fracture or dislocation. (Tr. 602). Dr. Cochran's assessment revealed that Buchanan's symptoms were reproducible and consistent with persistent cubital tunnel. (*Id.*).

A nerve conduction study and electromyography report by William J. Washington, M.D. from March 9, 2021 revealed normal latency but low amplitude median motor responses. (Tr. 599-600). Other nerve conduction testing showed normal findings of the ulnar nerve. (Tr. 600). Monopolar needle EMG exam showed 2+ fibrillation potentials in the mid and low cervical paraspinals and the left extensor digitorum communis that muscle shows neurogenic motor units.

(*Id.*). Neurogenic motor units were also seen in the left pronator teres. (*Id.*). The reason for the test was left upper extremity numbness and pain, history of bilateral carpal tunnel surgery and bilateral ulnar nerve transposition. (Tr. 599). Dr. Washington's impression is as follows:

> EMG findings of fibrillations in the cervical paraspinals and 1 limb muscle (predominantly C 7, 8 innervated) suggest probable cervical radiculopathy subacute. The pronator teres also reveals mild neurogenic motor units but no fibrillation potentials. This suggests probable C7 root involvement. Clinical correlation with imaging recommended. Low amplitude median motor response of questionable significance as patient had prior carpal tunnel surgery.

(Tr. 600).

On March 16, 2021, Buchanan presented to an appointment with Dr. Cochran with left upper extremity ("LUE") symptoms. (Tr. 595). Dr. Cochran reviewed the March 9, 2021 EMG and took x-rays of the cervical spine which revealed no notable findings of degeneration of the vertebral bodies or facet joints with well-maintained disc space, and no acute fractures. (Tr. 596). Dr. Cochran recommended physical therapy. (*Id.*).

Buchanan received physical therapy for cervical radiculopathy from March 30, 2021 through May 3, 2021 (Tr. 587-94; 787-833). Treatment notes from these sessions indicate that the physical therapy goals included decreasing pain, improving LUE sensation, and improving strength. (Tr. 587, 591). Treatment notes indicate that Buchanan demonstrated improvement with pain, strength, posture, ROM, and overall function. (Tr. 589). Physical therapy was discontinued on May 3, 2021 because Buchanan's goals were met. (Tr. 589).

On June 22, 2021, Buchanan saw Jeffrey M. Cochran DO. (Tr. 582). Notes from this encounter state that Buchan reported pain in his left shoulder and neck had "completely subsided" following completion of physical therapy. (Tr. 582). Buchanan reported that "his left upper extremity symptoms ha[d] completely resolved" following physical therapy and "his range of motion and strength have improved." (Tr. 584). An exam of his shoulder and elbow revealed

6

that Buchanan was non-tender to palpitation over his acromioclavicular joint, deltoid, posterior shoulder, bicipital tendon, and had normal strength and intact gross sensation in his upper extremities. (Tr. 583).

During a June 29, 2021 appointment, Dr. Brown noted that Buchanan had full range of motion in his extremities without limitation. (Tr. 742).

### C.   Medical Opinion Evidence

Buchanan presented for a consultive examination with Michael J. Harvan, Ph.D. on April 7, 2016. (561-67). Following the evaluation, Dr. Harvan found that Buchanan was "likely to have some difficulty remembering job instructions in the long-term. He is also likely to have some difficulty understanding job instructions that are given in figurative language or are implied." (Tr. 566). Dr. Harvan further found that Buchanan "had some difficulty focusing attention and concentrating" but that his "pace and performance was normal" and he "persisted at tasks" during the evaluation. (Tr. 566). Buchanan was also "likely to have no difficulty responding appropriately to supervision and to fellow employees in a work environment." (Tr. 566). Finally, Dr. Harvan found that Buchanan was "likely to have no difficulty responding appropriately to the pressures of a normal work environment." (Tr. 567).

On April 14, 2016, Buchanan presented for a consultive physical examination with Sam N. Ghobrial M.D. (Tr. 570-79). In his report, Dr. Ghoubrial listed the following impression: "I feel [Buchanan] would have some difficulty lifting and carrying objects. I don't feel he would have any difficulty hearing, speaking, seeing or traveling. I don't feel he would have any difficulty sitting and handling objects or walking short distances." (Tr. 578).

At the initial review level on October 13, 2021, state agency reviewing psychologist Courtney Zeune, Psy.D., found that Buchanan could work at a consistent pace in a setting that

does not require prioritizing of assigned tasks and could adapt to a setting in which duties are routine and predictable. (Tr. 292).

On October 28, 2021, state agency reviewing physician, Rannie Amiri, M.D. adopted the RFC given by the ALJ in the May 10, 2018 decision. (Tr. 289). Upon review, Dr. Amiri found that Buchanan could stand, walk, or sit for roughly six hours per eight-hour workday. (Tr. 290). Dr. Amiri stated that the RFC limitations were supported based on Buchanan's current severity. (Tr. 291).

At the reconsideration level, Jennifer Whatley, Ph.D. adopted the findings of Dr. Zeune on March 6, 2022. (Tr. 313). Indira Jasti, M.D. found Dr. Amiri's findings consistent with and supported by the overall evidence on March 8, 2022. (Tr. 317).

###     D.     Administrative Hearing Evidence

Buchanan testified that he lives on a ground floor apartment with his wife and children. (Tr. 234). Buchanan's children are 18 and 13. (Tr. 235). Buchanan's wife is disabled; she cannot open and close her hand all the way which requires Buchanan to help her comb her hair and get her coffee. (Tr. 235-36). However, Buchanan stated that she could do more for him than he could do for her. (*Id.*). Buchanan's wife helps him get his clothes together, put his socks and shoes on when he cannot bend, and clean the house with the children. (Tr. 236). Buchanan is 5'4" tall and weighed 235 pounds at the time of the hearing. (Tr. 245). He explained that his weight fluctuates by ten pounds. (*Id.*).

Explaining a typical day, Buchanan stated that he has no trouble cooking a meal but can only do the dishes while he is sitting. (Tr. 247). He can vacuum for 20 minutes without issue before needing to sit or lie down. (*Id.*). He can mop a small room, but then needs a 15- to 20-minute break. (*Id.*). Buchanan often orders his groceries online to avoid walking around the

8

store. (*Id.*).  Buchanan stated that he can drive "but not far." (Tr. 235).  He can drive for an hour and a half before needing to stop and rest. (*Id.*).

Buchanan completed high school. (*Id.*). At the time of the hearing, he was working part-time approximately three hours per day but needed "to rest continuously." (*Id.*). Buchanan worked at the YMCA vacuuming, mopping, and dusting. (*Id.*). Buchanan takes frequent breaks because of his back and knees. (*Id.*).

Prior to the YMCA, Buchanan worked full time as a stocker at Wal-Mart. (Tr. 237). At that job, Buchanan's typical daily tasks included bringing out pallets, putting away stock, breaking down boxes, putting boxes in the baler, rearranging the deep freezer, and straightening up shelves. (*Id.*). That job required him to lift or carry 35-40 pounds. (*Id.*)

When asked what prevents him from working, Buchanan testified that anytime he tried to do anything his lower back "flare[d] up a lot." (Tr. 238). Buchanan added that his knees were weak, his depression and anxiety were high, and he could not be around a lot of people without going "into a panic shock." (*Id.*).

Explaining his back condition, Buchanan stated that it is sore and swells and flares up a lot no matter what he does. (Tr. 239). Buchanan takes pain medication, uses a TENS unit, and ices it three to four times a day. (*Id.*). The pain medication makes him drowsy, so he waits until he is home from work to take it. (*Id.*). The pain is located in the "center and middle" of his back and radiates from left to right depending on activity. (*Id.*). Vacuuming, wiping things down, mopping, "going up and down", and carrying over 30 pounds causes the pain to radiate. (*Id.*). The more he moves, the more pain he feels. (Tr. 240). Reaching above his head and bending forward cause pain in his back. (Tr. 243). Reaching also agitates his right shoulder. (Tr. 250). He

explained having no difficulty washing his hair, but reaching something from the top shelf at a grocery store would not be possible. (*Id.*). Buchanan feels back pain daily. (Tr. 239-40).

Buchanan can stand for 30 minutes at a time before needing to sit down due to the pressure on his back and legs. (Tr. 241). Further, he can only walk for 15 minutes before needing to sit for 20 to 25 minutes. (*Id.*). Buchanan can only sit for 30 to 45 minutes before starting to feel back pain. (*Id.*). When that happens, he tries to move around or lay down. (*Id.*). Buchanan explained that he does many things laying down on his side including watching tv, reading a book, talking with family, and using the computer. (Tr. 242).

Buchanan also described having neck pain. At the time of the hearing, he had recently gone to the hospital because he "could barely move [his] neck around." (Tr. 240). He ices and applies heat to relieve the neck pain. (*Id.*).

At a maximum, Buchanan felt he could lift 25 to 30 pounds in a workday. (Tr. 242). His hands "freeze up" where he cannot move his fingers for 15 minutes approximately once or twice a week. (Tr. 242-43). When this happens, he tends to drop things. (Tr. 249). At times he can "barely hold things" and his hands will shake. (*Id.*). He experiences this in both hands, but it alternates between left and right. (Tr. 250).

Buchanan also suffers from migraines for which he takes medication. (Tr. 251). While taking his medication, he experiences migraines every other day that he ranks as a six on a ten-point scale, however if he stops taking the medication, they occur every day. (Tr. 251-52). When he gets a migraine, he treats it with a cold compress or ice pack. (Tr. 252). There are no specific triggers for his migraines. (*Id.*). He does not experience any side effects from his medication. (Tr. 251).

Discussing how his mental health conditions affect his ability to work, Buchanan stated that if he is around four or more people at a time, he feels agitated, panicked, and has anxiety attacks. (Tr. 244). When that happens, he needs to immediately leave and find a place that is less crowded. (*Id.*). Buchanan explained that he sleeps 12 to 13 hours per day, has low energy, lacks motivation and occasionally loses his appetite. (Tr. 244-45). Buchanan experiences anxiety attacks that last approximately 15 minutes twice a week. (Tr. 246). When he experiences an anxiety attack, he shakes, sweats, holds his hands and feels agitated. (*Id.*). However, he explained that he makes sure to get out of bed every day. (Tr. 248). Discussing his PTSD, Buchanan stated that he experiences nightmares once a week, (Tr. 252).

Regarding his ability to follow instructions, Buchanan testified that he "can follow some to a point" but eventually gets "lost a little bit down the line." (Tr. 246). For example, if someone gives him directions how to get somewhere, halfway through he gets lost. (*Id.*).

The VE testified that Buchanan's work history included stocker, DOT 299.367-014, heavy and semi-skilled performed at medium, SVP 4. (Tr. 256). The VE further testified that a hypothetical individual of Buchanan's same age, education, and vocational background, who could perform light work, could never climb ladders, ropes, or scaffolds, never crawl, could occasionally climb ramps and stairs, occasionally balance, stoop, kneel, and crouch, frequently reach with the right upper extremity, frequently handle and finger with bilateral upper extremities, avoid concentrated exposure to extreme cold and vibrations, loud noises, and bright lights (brighter than a typical office setting), avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and commercial driving, performing simple, routine, or repetitive tasks, but could not perform tasks requiring a high production rate pace, such as assembly line work, could respond appropriately to only occasional change in routine and

relatively predictable work setting, would be unable to perform Buchanan's past work. (Tr. 256-57).

A hypothetical individual with those limitations could perform the jobs of deli clerk, DOT 316.684-014, light unskilled, SVP 2, with 30,000 jobs nationally; information clerk, DOT 237.367-018, light unskilled, SVP 2, with 15,000 jobs nationally; office helper, DOT 239.567-018, light unskilled, SVP 2, with 18,000 jobs nationally. (Tr. 257).

If the hypothetical individual was reduced to reaching occasionally overhead but still frequently in all other directions with the right upper extremity, that individual could still preform the jobs of deli clerk, information clerk, and office helper the VE described. (Tr. 257-58).

If the hypothetical individual was further reduced to reaching occasionally in all directions with the right upper extremity, that limitation would be work preclusive. (Tr. 258). Additionally, if the second hypothetical individual were also limited to occasional handling and fingering with the bilateral upper extremities, that limitation would also be work preclusive. (*Id.*).

If the first hypothetical individual was limited to sedentary exertional range, that hypothetical individual could perform the job of order clerk, DOT 209.567-014, sedentary unskilled, SVP 2, with 7,000 jobs nationally; phone quotation clerk, DOT 237.367-046, sedentary unskilled, SVP 2, with 35,000 jobs nationally; and charge account clerk, DOT 205.367-014, sedentary unskilled, SVP 2, with 10,000 jobs nationally. (*Id.*). If the individual were further limited to reaching overhead occasionally with the right upper extremity but frequently in all other directions, that individual could still perform the jobs of order clerk, phone quotation clerk, and charge account clerk.  (Tr. 259). If this hypothetical individual were limited

12

to occasional reaching in all directions with the right upper extremity, it would be work preclusive. (*Id.*). If the hypothetical individual were limited to handling and fingering from frequent to occasional with the bilateral upper extremities, that would also be work preclusive. (*Id.*).

Regarding an individual's need to change positions at work from sitting to standing, the VE testified that in her opinion the individual needs to be able to be in a position for at least 30 minutes, and if that were limited to only 15 or 20 minutes per position, it would be work preclusive. (*Id.*). Further, if an individual required an isolated work environment, that would be work preclusive. (Tr. 260).

As for absenteeism and time off task in unskilled work, the VE testified that employers tolerate absenteeism of no more than one time a month and no more than ten percent time off task. (Tr. 259).

## IV.   The ALJ's Decision

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.

2.   There exists new and material evidence concerning the claimant's residual functioning, such that I do not adopt all of the findings of the prior administrative law judge decision dated May 10, 2018 (B1A).

3.   The claimant has not engaged in substantial gainful activity since September 23, 2017, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

4.   The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine, post-laminectomy syndrome, cervical radiculopathy, sacroiliitis, bilateral osteoarthritis of the knees, patellofemoral syndrome, right shoulder impingement syndrome, bilateral carpal tunnel syndrome, left ulnar nerve lesion, migraines, obesity, depressive disorder, anxiety disorder, posttraumatic stress disorder [PTSD] (20 CFR 404.1520(c) and 416.920(c)).

5.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following additional limitations. The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds, and can never crawl. The claimant can occasionally balance, stoop, kneel, and crouch. The claimant can frequently reach with the right upper extremity, and can frequently handle and finger with the bilateral upper extremities. The claimant must avoid concentrated exposure to extreme cold, vibrations, loud noise, and bright lights (brighter than a typical office setting). The claimant must avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and commercial driving. The claimant can perform simple, routine, and repetitive tasks, but cannot perform tasks which require a high production rate pace (e.g., assembly line work). The claimant can respond appropriately to occasional changes in a routine and relatively predictable work setting.

7.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.   The claimant was born on September 8, 1969 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

9.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

10.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.   The claimant has not been under a disability, as defined in the Social Security Act, from September 23, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14

(Tr. 13-22).

V.      **Law & Analysis**

A.      **Standard for Disability**

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir.

2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears

the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled

to benefits. 20 C.F.R. § 404.1512(a).

B.      **Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by

substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g);

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial

evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103

(2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen,* 478 F.3d at 749.

16

## VI.    Discussion

In his brief, Buchanan raised the following four issues for the Court's review:

1.      This matter should be remanded pursuant to Sentence Six to consider new
        and material evidence presented to the Appeals Council.

2.      The ALJ erred and his decision was not supported by substantial evidence
        when he failed to properly evaluate the opinions of the treating and
        examining sources in accordance with 20 CFR 404.1520c and 416.920c.

3.      The ALJ failed to support his RFC with substantial evidence when he
        applied the wrong standard of review by adopting the findings of the prior
        Administrative Law Judge.

4.      The ALJ erred and his decision was not supported by substantial evidence
        as he failed to properly evaluate Plaintiff's problems with using his upper
        extremities.

At times Buchanan's arguments will be addressed out of order for ease of discussion.

### A.    The Record Does Not Warrant a Sentence Six Remand

In his first issue raised before the Court, Buchanan argues that the case should be

remanded pursuant to sentence six of 42 U.S.C. § 405(g) to consider medical records regarding a

September 29, 2023 post laminectomy syndrome surgery to implant a T10 partial laminectomy

for implantation of a spinal cord stimulator.[1]

A court may remand a case for the Commissioner to consider newly discovered evidence

pursuant to sentence six of 42 U.S.C. § 405(g). To obtain such a remand, the claimant must show

that: (1) the evidence is new; (2) the evidence is material; and (3) good cause excuses the

claimant's failure to incorporate the evidence into a prior administrative proceeding.  42 U.S.C.

§ 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  "New

evidence" is evidence that did not exist or was not available to the claimant at the time of the

---

[1] I note that Buchanan states that subsequent to the ALJ's decision, he also had a colonoscopy.
(ECF Doc. 8, p. 5). However, his argument regarding the sentence six remand is limited to the
spinal cord stimulator, and thus my analysis will likewise be limited to that procedure.

administrative proceeding. *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990). To be material, the evidence must be: (1) chronologically relevant, *i.e.* reflect upon the claimant's condition during the relevant period; and (2) probative, *i.e.*, have a reasonable probability that it would change the administrative result. *See Casey*, 987 F.2d at 1233 (holding that a claimant's new evidence was not material because it did not show a "marked departure from previous examinations" and it "pertain[ed] to a time outside the scope of our inquiry"); *accord Winslow v. Comm'r of Soc. Sec.*, 556 F. App'x 418, 422 (6th Cir. 2014). And the Sixth Circuit takes a "harder line" approach to good cause – a claimant cannot simply point to the fact that the evidence was not created until after the ALJ hearing but must establish good cause for why he did not cause the evidence to be created and produced until after the administrative proceeding. *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001).

Buchanan's date last insured was March 31, 2018. The ALJ issued his decision on January 10, 2023. (Tr. 8-22). Buchanan did not receive the spinal cord stimulator until September 29, 2023. (Tr. 61). These records also indicate that following the implantation of the spinal cord stimulator, Buchanan expressed 90% relief of his symptoms with the trial stimulator. (Tr. 152). Further, the ALJ considered Buchanan's post laminectomy syndrome, his ongoing tenderness and muscle spasms, and his use of a TENS unit for relief of his symptoms before finding that despite the foregoing Buchanan showed no significant strength loss in his lower extremities which indicated residual ability to stand and walk independently. (Tr. 17). Accordingly, Buchanan has not demonstrated how the consideration of a medical record for a procedure that provided him a reduction of 90% of his back pain which also occurred more than five years after the DLI and eight months after the ALJ's decision has a reasonable probability of

changing the Commissioner's disability determination. I therefore decline to recommend remand on this basis.

**B.      The ALJ Did Not Adopt the Findings of the Previous ALJ**

In his third error raised before this Court, Buchanan argues that the ALJ erred when he made "his RFC determination based on the prior ALJ determination" and thus "applied the wrong legal standard." (ECF Doc. 8, p. 18). He contends that the "even though he stated he did not, the ALJ erroneously relied on the prior ALJ determination" when crafting his RFC. (*Id.* at p. 20).

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997). The Sixth Circuit held that *res judicata* applies in the administrative context and thus the second ALJ was bound by the RFC findings of the first ALJ because there had been no new or additional evidence of an improvement in the claimant's condition. *Id*. at 841-42 ("Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.").

In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling (AR) 98-4(6):

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6) (S.S.A.), 1998 WL 283902, *3 (June 1, 1998).

Subsequently, in *Earley v. Commissioner*, the Sixth Circuit modified its holding in *Drummond*, explaining that the "[u]nusual facts" had led to an overstatement of the principles of *res judicata* involved in subsequent applications under the Social Security Act. *Earley v. Comm'r of Soc. Sec.,* 893 F.3d 929, 933 (6th Cir. 2018). The court clarified that *res judicata* barred only successive litigation of the same claim, and that a subsequent claim alleging a later onset date and disability period was not the same claim. *Id.* ("An individual may file a second application—for a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory threshold."). It stated, "human health is rarely static. . . . Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Id.*

Nevertheless, "[f]resh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934. Thus, when a new application seeks benefits for a distinct time period, that application is entitled to a "fresh look" while still being mindful of past agency rulings and their corresponding record. *Id.* at 931.

Buchanan was awarded SSI on May 10, 2018. In that decision, Buchanan was found to be disabled from October 7, 2015 through September 22, 2017. However, the prior ALJ found that Buchanan had medically improved as of September 23, 2017 and found that as of that date, Buchanan had the following residual functional capacity:

> To perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that claimant could never climb ladders, ropes or scaffold. He could occasionally climb ramps or stairs. He could occasionally balance, stoop, kneel, crouch but never crawl. He could frequently handle and finger objects bilaterally. He should never use moving machinery.

(Tr. 279).

Buchanan then applied for another term of disability, the present application, alleging an onset date of September 23, 2017. Thus, under *Drummond* and *Earley*, Buchanan was entitled to a fresh look by the ALJ for his subsequent claim for disability with a later onset date. I find that the ALJ did just that.

In his decision, the ALJ found Buchanan had the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following additional limitations. The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds, and can never crawl. The claimant can occasionally balance, stoop, kneel, and crouch. The claimant can frequently reach with the right upper extremity, and can frequently handle and finger with the bilateral upper extremities. The claimant must avoid concentrated exposure to extreme cold, vibrations, loud noise, and bright lights (brighter than a typical office setting). The claimant must avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and commercial driving. The claimant can perform simple, routine, and repetitive tasks, but cannot perform tasks which require a high production rate pace (e.g., assembly line work). The claimant can respond appropriately to occasional changes in a routine and relatively predictable work setting.

(Tr. 16).

While it is obvious that there are common limitations in both RFCs, I do not agree with Buchanan's statement that the ALJ improperly relied on the previous ALJ's decision when crafting an RFC. The RFC in the decision before this Court differs from that of the previous ALJ when Buchanan was found to have medically improved. The ALJ added various limitations which were not in the previous RFC demonstrating that the ALJ gave the case a fresh look as was required by *Drummond* and *Earley*. Accordingly, I find no merit in Buchanan's argument and decline to recommend remand on this basis.

C.    **The ALJ Failed to Build an Accurate and Logical Bridge Between the Evidence and the RFC**

In his second and fourth errors raised before this Court, Buchanan challenges various aspects of the ALJ's RFC. Because I find the specific issue raised in the fourth error dispositive, I focus my attention on said issue.

In his final error, Buchanan argues that the ALJ failed to "to build an accurate and logical bridge between the evidence" regarding his limitations with using his upper extremities and his decision to deny benefits. (ECF Doc. 8, p. 24). In making this argument, he acknowledges the fact that the ALJ found he had severe impairments related to his cervical radiculopathy, right shoulder impingement syndrome, bilateral carpal tunnel syndrome, and left ulnar nerve lesion, however he asserts the ALJ "failed to account for the[se] symptoms when promulgating his RFC." (*Id.* at p. 21).

In the RFC, the ALJ found that Buchanan could "frequently reach with the right upper extremity, and can frequently handle and finger with the bilateral upper extremities." (Tr. 16). Explaining the RFC, the ALJ found that Buchanan's

> allegations of his hands locking up and acute pain in the right shoulder are not corroborated by the record. [Buchanan] presents with a history of carpal tunnel syndrome, ulnar nerve impingement, and right shoulder impingement. These issues somewhat overlap with EMG findings of probable cervical radiculopathy with C7 nerve root involvement (B3F21). However, I note that these EMG findings date March 9, 2021 were noted to be subacute in severity (B3F21). Physical status examinations have consistently shown [Buchanan] to have full muscle strength and range of motion in both upper extremities (B3F23). He has not shown significant tenderness over the right shoulder joint (B3F4). The treatment records do not document any episodes of his hands being locked up, as he described in the hearing testimony. . . . [The restrictions in the RFC] should greatly reduce the amount of strain placed on the upper extremities during a typical workday.

(Tr. 18).

22

Although the ALJ states that Buchanan has not shown significant tenderness over the right shoulder joint, I find ample support in the record regarding pain in Buchanan's right shoulder. Records indicate that Buchanan first presented to Dr. Cochran on October 31, 2017. (Tr. 685). An x-ray from that visit revealed no bone abnormalities or alignment issues, however, following a physical exam Dr. Cochran noted signs of subacromial impingement syndrome with a component of biceps tendonitis. (*Id.*). While the ALJ's statements are true regarding shoulder and elbow exams revealing full muscle strength and range of motion in the upper extremities, Buchanan's treating physicians also noted pain in bicipital groove, and sclerosis at rotator cuff insertion. (Tr. 676, 783). The medical records further demonstrate that Buchanan received at least five injections in his right shoulder for treatment of pain. (Tr. 635, 656, 663, 676, 685).

Furthermore, my review of the medical records indicates some support in the record for Buchanan's assertion that his hands lock up. On April 17, 2019, after his DLI, Buchanan reported to Dr. Moretta that his left hand becomes numb, and his fingers lock up. (Tr. 652). Dr. Moretta found that Buchanan's symptoms were consistent with recurrent left carpal tunnel syndrome and suspected median neuritis and recommended NSAIDs and a nighttime brace. (*Id.*).

Buchanan also asserts that the ALJ erred by failing to include limitations regarding his "inability to work with others, missing work 1 to 2 times a month, difficulty lifting and carrying objects, and would have difficulty remembering job instructions." (ECF Doc. 8, p. 15). Buchanan cites to the Mental Health Questionnaire of his treating therapist in support of these limitations. (*Id.* at p. 13). In the Mental Health Questionnaire, Stephanie Martin, APN found Buchanan would be absent from work one to two times per month, off task 30-40% of the time, and unable to get along with coworkers or peers. (Tr. 1310-11). The ALJ did not find these statements credible because they were not given with explanation or reference to specific

instances of conduct. (Tr. 20). In challenging the ALJ's statement regarding the persuasiveness of APN Martin's findings before this Court, Buchanan does not provide any specific instances that demonstrate that the ALJ's findings are unsupported by substantial evidence, rather he simply argues they should have been considered. Because the ALJ specifically referenced APN Martin's findings regarding these limitations before finding the opinion of little percussive value, I do not agree with Buchanan's arguments.

Accordingly, I find error in the statements by the ALJ that the medical records do not corroborate Buchanan's hearing testimony regarding his hands locking up and the acute pain in his right shoulder. Based on this error, I cannot determine whether the ALJ discredited or merely overlooked the relevant evidence in the record. *See Shrader*, No. 11-13000, 2012 WL 5383120, at *6. The ALJ thus did not build an accurate and logical bridge between the evidence in the record regarding Buchanan's right shoulder pain and instances of his hands locking up, and the RFC determination. *See Fleischer*, 774 F. Supp. 2d at 877. However, I do not find error with regard to the ALJ's findings regarding APN Martin's recommended limitations. I therefore recommend that the District Court remand for reconsideration of the RFC regarding Buchanan's upper extremities.

**VII.    Recommendation**

Because the ALJ failed to build and accurate and logical bridge between the evidence in the record and the RFC determination I recommend that the Commissioner's final decision denying Buchanan's applications for DIB and SSI be vacated and Buchanan's case remanded for further consideration.

Dated: October 24, 2024

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### <u>Objections, Review, and Appeal</u>

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).